# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| TOBY J. LANSFORD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:14-CV-87-RLW |
| | ) |
| CAROLYN COLVIN, | ) |
| ACTING COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of

Social Security's final decision denying Toby J. Lansford's ("Lansford") application for

disability insurance benefits under Title II of the Social Security Act. Lansford alleges disability

due to impairments including bad knees, bad vision in his right eye, limited motion in right arm,

and difficulty breathing through his nose. (Tr. 298).

## I. **Background**

Lansford allege that he became disabled on June 20, 2008. (Tr. 18). The Social Security

Administration ("SSA") denied Lansford's application for benefits and he filed a timely request

for a hearing before an Administrative Law Judge ("ALJ"). The SSA granted Lansford's request

and a hearing was held on July 3, 2012. (Tr. 35-73) The ALJ issued a written decision on

September 19, 2012, upholding the denial of benefits. (Tr. 16-29.) Lansford requested an

extension of time to file additional evidence regarding his medical care. (Tr. 12.) Lansford also

requested a review of the ALJ's decision by the Appeals Council. (Tr. 8-11.) The Appeals

Council received a representative brief, which it made part of the record. (Tr. 5.) The Appeals Council denied Lansford's request for a review. (Tr. 1-3.) The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Lansford filed this appeal on January 17, 2014. (ECF No. 1.) The Commissioner filed an Answer. (ECF No. 5.) Lansford filed a Brief in Support of his Complaint. (ECF No. 13.) The Commissioner filed a Brief in Support of the Answer. (ECF No. 19.) Lansford filed a reply brief in support of his Complaint. (ECF No 20).

## II.    Decision of the ALJ

The ALJ found that Lansford had severe impairments of depression, alcohol dependence, blindness in right eye, and arthritis. (Tr. 19-21.) The ALJ determined that Lansford had the following severe impairments: depression, alcohol dependence, blindness in the right eye, and arthritis, but that he did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 13.) The ALJ determined that Lansford retained the capacity to perform medium work in that he can lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand or walk for six hours out of an eight-hour workday, and sit for six hours out of an eight-hour workday, except that he must avoid climbing ropes, ladders or scaffolds, and hazards of heights and machinery. The ALJ noted that Lansford has no vision in his right eye, but his vision is normal in his left eye. The ALJ found that Lansford is able to understand, remember, and carry out at least simple instructions and non-detailed tasks. The ALJ stated that Lansford should not perform work in a setting which requires constant/regular contact with the general public which includes more than infrequent handling of customer complaints. (Tr. 21-27.) The ALJ found that Lansford has the residual functional capacity ("RFC") to perform

2

medium work. The ALJ discerned that Lansford has normal vision in his left eye. The ALJ found that, based in part upon a GAF of 55, which was found in Dr. Rexroat's findings, Lansford has only moderate psychological impairment. The ALJ found that Lansford is unable to perform any past relevant work. (Tr. 27.) The ALJ determined that jobs exist in significant numbers in the national economy that Lansford can perform, including housekeeper/cleaner, mail sorter, and bench assembler. Consequently, the ALJ found Lansford was not disabled, as defined under the Social Security Act.

Lansford appeals contending that the ALJ (1) improperly failed to take into account Lansford's mental impairments, in particularly his repeated GAF scores, (2) the ALJ improperly failed to take into account Lansford's multiple surgeries to his right eye and the recovery periods, (3) the ALJ improperly found that Lansford's vision was normal in his left eye, (4) the ALJ filed to give proper credit to the report of Lansford's treating physician, Dr. Thomas Jackson, (5) the ALJ improperly determined that Lansford did not meeting listing 12.04, (6) the ALJ filed to take into account Lansford's age and training, (7) the ALJ failed to properly take into account all of Lansford's impairments in determining his RFC, and (8) there is no substantial evidence that Lansford can return to his former work and that Lansford can perform other work. (ECF No. 13 at 1-2.) The Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

## III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A. Hearing Testimony

#### 1. Lansford's Testimony

Lansford testified on July 3, 2012 as follows.

Lansford lives at home with his parents, and occasionally his son and daughter. (Tr. 38.) He has a 12th grade education, plus additional training in construction, specifically brick work, masonry, and plastering. (Tr. 39-42.) He did not participate in vocational rehabilitation as part of receiving unemployment benefits. (Tr. 45.) He was in prison three times from 2001 to 2003 and then also in 1995 or 1997. (Tr. 45-46.) He has been in jail less than ten times. (Tr. 46-47.) He has had 7 or 8 DUIs and DWIs. (Tr. 47.) He has been in rehab for drug and/or alcohol abuse four times, including most recently about a month ago. (Tr. 48.) He went to the Phoenix Program in Columbia, OCC in Springfield, and treatment in Farmington. (Tr. 48-49.) In 2010, he was taken by police for psychological treatment to somewhere in St. Charles. (Tr. 50-51.) He last had alcohol three months ago. (Tr. 52.) He did not recall being told not to mix alcohol with his psychotropic medications. (Tr. 52.) He states that he has been taking his medication as prescribed for about two months—since his last relapse. (Tr. 52-53.) He states that he previously stopped taking medications when they made him hallucinate or sleep all the time. (Tr. 53-54.)

He has had problems with his left eye since he was hit with a golf club in 2004 or 2005. (Tr. 54.) He has tried to work, since then but he keeps getting fired from his employment. (Tr. 55.)

Lansford tries to help around the house but he breaks the dishes and does the laundry wrong. (Tr. 55.) He tries to cut the grass but misses an entire section of the lawn. (Tr. 56.) He cannot cook because he burns or undercooks everything, or forgets about it. (Tr. 56.) He walks about five or six blocks every day to go shopping for groceries, which he pays for with food stamps. (Tr. 56.) He does not have a driver's license. (Tr. 57.) He wakes up at 5:30 or 6:00 a.m. and then makes some breakfast, including frying an egg or toast. (Tr. 57-58.) He spends the rest

4

of the day watching TV, sitting in a chair in the yard, or sleeping. (Tr. 58.) He walks to AA and NA meeting one to three times per week—approximately 4-6 blocks away. (Tr. 58-59.)

Lansford last had vision in his right eye about two years ago when he had a chemical spill in his eye. (Tr. 59.) He had six or seven surgeries but he still has no vision in his right eye. (Tr. 60.) He has limited vision in his left eye—he could not read the clock in the hearing room. (Tr. 60.) His eye issues cause him terrible migraine headaches every day, for an hour or an hour and a half. (Tr. 61.) He has been having these headaches for three or four years. (Tr. 61.) According to the ALJ, there are no mention of headaches in his records from his family care doctor. (Tr. 61.)

Lansford has suicidal thoughts every day. (Tr. 62.) He has problems with rage and anger every day. (Tr. 62.) He acts out by throwing things or hollering at the people he loves. (Tr. 63.) He has problems with his personal hygiene. He can go a week without taking a shower. (Tr. 63.)

## B.    Medical Records

Lansford's relevant medical records are summarized as follows:

On June 16, 2006, he repaired the corneal/scleral laceration. (Tr. 468.) On August 17, 2007, Lansford had an implant was placed in the right eye to repair a dislocated lens. (Tr. 418-19.) On August 14, 2007, Dr. Jackson noted that Lansford suffers from anger problems and mood swings. (Tr. 426.)

On September 5, 2008, Lansford's mother, Violet Lansford, filled out a Function Report regarding her son. (Tr. 328-36.) She indicated that Lansford doesn't take care of himself. He only bathes, combs his hair and changes his clothes every two or three days. She stated that he is very moody and she can't be around him. During the day, he sleeps, watches TV, eats, goes

5

outside with friends, and looks for work. She said sometimes he sleeps for a long time and other times he doesn't sleep at all. She said that he goes out a lot and enjoys being in the fresh air. He doesn't have a license or drive because of his DWI's. She said that he fishes and watches TV for hobbies. He goes out with friends 2-3 times per week. He is moody and cusses; he "don't care about anything." She said he doesn't have a social life because no one wants to be around him due to his drinking, cussing, and moods. He forgets everything and can only pay attention for 5 minutes.

On October 27, 2008, Paul W. Rexroat, Ph.D. performed a psychological evaluation of Lansford. (Tr. 429-32.) Lansford admitted he is an alcoholic. Dr. Rexroat estimated that Lansford's IQ was in the low average range. Lansford described symptoms of major depression. Dr. Rexroat found Lansford had the ability to understand and remember simple instructions. Lansford said he has a bunch of friends but doesn't see them because he isn't making money or drinking. He sees his friends about once a week when they drop by. He sees his children for an hour and a half on Wednesdays. Lansford reported no homicidal ideation or attempts, occasional suicidal ideation but no attempts, and no paranoia, hallucinations or delusions. Dr. Rexroat determined that Lansford had a GAF of 49.

On November 19, 2008, Marc Maddox performed a psychiatric review of Lansford's records. (Tr. 433-47.) Dr. Maddox determined that Lansford suffers from affective disorders and substance addiction disorders (alcohol dependence). Dr. Maddox determined that Lansford can perform simple repetitive tasks in an unskilled work setting. He can understand, remember, and carry out simple instructions; deal with routine work changes; and make simple work-related decisions. Dr. Maddox stated Lansford will have difficulty getting along with others and, therefore, will do best in a setting where social contact is limited and he can complete tasks

6

relatively independently. Dr. Maddox noted, however, that Lansford's dependability and reliability would be adversely impacted when he drinks.

On November 26, 2008, Lisa Buhr performed a mental RFC assessment. (Tr. 448-52.) She determined that his functional limitations were more limited by his mental condition than his physical condition. She noted that Lansford prepares meals and completes household chores. He is unable to drive due to DWI's. He watches TV. Medical records show that Lansford takes over the counter Advil for plain relief. She stated Lansford had no medically determinable impairment for a knee condition, arm condition, or breathing condition.

On April 1, 2009, Lansford underwent an MRI of the right knee, which indicated he suffered from osteoarthritis that is moderately severe with a minis cal tear. (Tr. 520.) The MRI of the left knee indicated mild osteoarthritis with small joint effusion. (Tr. 521.)

On August 29, 2010, Lansford was seen at Mercy hospital for facial swelling and shoulder pain after being in a fist altercation 4 days prior. (Tr. 873-85.)

On August 31, 2010, Lansford was evaluated by Dr. Praveeen Nimmagadda for a DSM-IV Diagnostic Report. (Tr. 542-43.) Lansford was assigned a GAF score of 55.

On October 2, 2010, Lansford was seen at Mercy hospital for pain to his right eye. (Tr. 888-93.)

On October 18, 2010, Lansford was seen again by Dr. Rexroat for a psychological examination. (Tr. 622-25.) He was estimated to be at the low average level of intelligence. Dr. Rexroat found Lansford was able to understand and remember simple instructions. He could sustain concentration and persistence with simple tasks. He had marked limitations in his ability to interact socially. He could adapt to his environment. He was diagnosed with alcohol-induced mood disorder and a personality disorder. He was assigned a GAF score of 45.

7

In October 2010, Lansford suffered a chemical injury to the right eye and his cornea was opaque as a result. (Tr. 468.) On January 10, 2011, Lansford received an ocular surface reconstruction with lateral tarsorrhaphy to the right eye. (Tr. 732.) Despite these surgeries, Lansford lost use of his right eye. (Tr. 627, 1099 (indicating that Lansford's vision in his right eye was "extremely poor with only light perception behavior")) As of September 6, 2012, Dr. Korenfeld indicated that Lansford had a retinal hole in his left (good) eye. (Tr. 1099.) Dr. Korenfeld also stated that Lansford had 20/20 vision in his left eye. (*Id.*) On May 18, 2011, Lansford was seen by Dr. Jackson with complaints of headache throughout his entire head and mood disorder. (Tr. 569-71.) He experienced anxiety, compulsive thoughts, fatigue, manic episodes, poor concentration, indecisiveness, and sleep disturbance, but no feelings of worthlessness, hallucinations, panic attacks, or thoughts of suicide. He was prescribed Vicodin and Zyprexa. On June 1, 2011, Lansford was seen by Dr. Steven Couch regarding migraine pain behind his right eye. (Tr. 632.) On June 3, 2011, Lansford was seen at Mercy hospital for chronic eye and back pain. (Tr. 894-98.)

On June 6, 2011, Lansford was assigned a GAF of 30 by Jeanne Niehaus, Clinical Nurse Specialist. (Tr. 533-35.) Lansford was found to have behavior that was "considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function independently in almost all areas." He was in "[s]ome danger of hurting self or others." The police were contacted and affidavits were written to seek involuntary hospitalization. He stated that he stopped medications because they knocked him out and he could not work.

On June 10, 2011, Dr. Jackson completed a Medical Source Statement (Physical). (Tr. 456-61.) Dr. Jackson indicated that Lansford is unable to avoid ordinary hazards in the

8

workplace, such as boxes on the floors, doors ajar, or approaching people or vehicles. Dr. Jackson also stated that Lansford has "no right eye [vision] and his peripheral vision is impaired." Dr. Jackson found that Lansford "has severe mood disorder impairing his ability to concentrate and work."

On June 15, 2011, Lansford was seen by Dr. Philip Custer for pain behind his right eye. (Tr. 627.) Dr. Custer noted that Lansford had "[v]isual acuity without correction is bare light perception in the right eye and 20/60 pinholing to 20/30 in the left eye." (*Id.*) Dr. Custer said that he would perform surgery on the eye to relieve the pain. On July 18, 2011, Lansford was seen by Dr. Jackson for chronic pain in his eye and for his mood disorder. (Tr. 564-66.) He complained of lack of sleep, depressed mood, poor concentration, indecisiveness, and restlessness or sluggishness, but no manic thoughts or hallucinations. He was prescribed Zyprexa and Vicodin.

On November 7, 2011, Lansford was assessed by the Family Support Division, which indicated that Lansford was manic depressive, suffered from chronic pain in the right eye, and was unable to work due to worsening vision and trouble concentrating. (Tr. 463-64.)

On January 31, 2012, Lansford was seen by Dr. Jackson for a headache and a mood disorder. (Tr. 550-52.) He complained of anxiety, fearful thoughts, compulsive thoughts and behaviors and fatigue but no feelings of worthlessness, hallucinations or manic episodes. He was prescribed valproic acid for his headache, and to continue his Ativan and Zyprexa.

## IV. Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is

9

determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ... ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[1] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *see also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an

---

[1] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id.*; *see also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id.*; *see also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th

Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V.    Discussion

A. Listing 12.04

Lansford argues that he meets Listing 12.04 for affective disorders. (ECF No. 13 at 7-8.) Lansford stated, without citation to the record, that there was testimony in support of a finding of depressive syndrome, including sleep disturbance, cycle motor agitation, difficulties concentrating or thinking, thoughts of suicide and hallucinations. Lansford also argued, without citation to the record, that he had manic syndrome, characterized by at least three of the following: hyperactivity, flight of ideas, decreased need for sleep, easily distractible and involvement in activities that have a high probability of painful consequences and hallucinations.

In response, the government argues that the substantial evidence supports the ALJ's finding that Lansford did not meet or equal Listing 12.04 for affective disorders. (Tr. 20.) To meet listing 12.04, Lansford must show either that (1) he suffers from a condition or symptom listed in

12

Paragraph A which results in at least two of the four criteria listed in Paragraph B, or (2) he has a documented chronic affective disorder resulting in one of three criteria listed in Paragraph C. 20 C.F.R. Pt. 404, subpt. P, app. 1 § 12.04; *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). To meet Paragraph B of the listing, Lansford required a showing that a condition has resulted in two of the following four criteria: "(1) Marked restriction of activities of daily living; or (2) Marked difficulties in maintaining social functioning; or (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration." *Id.* at § 12.04(B). The government notes that Lansford focused in his brief on the Paragraph A criteria, but he cited no evidence from the record to support his argument. (ECF No. 19 at 4.) The government contends that the evidence supported a finding that Lansford had normal psychomotor activity. (Tr. 527, 529, 531, 623.) In addition, except on a few occasions, Lansford generally denied to his providers that he hallucinated. (Tr. 527, 529, 531, 550, 555, 573, 577, 582.) The government further contends that Lansford is largely relying on his own subjective statements, which the ALJ found not credible. (ECF No. 19 at 4-5.)

In addition, the government argues that Lansford has not shown that he meets the criteria for Paragraph B. The ALJ determined that Lansford did not have any marked restrictions or repeated episodes of decompensation. (Tr. 20.) Likewise, the ALJ found that Plaintiff had no restrictions in activities of daily living, based upon his ability to care of his children and dogs, cook meals, leave the house daily, mow the lawn, handle his own finances, handle his personal care, do household chores, watch television, play basketball, fish and hunt. (Tr. 20, 305, 310-13, 430, 624, 643.) The ALJ also found Lansford was mildly limited in social functioning. (Tr. 20.) Lansford did not have history of violence during the relevant period and interacted well with his doctors. (Tr. 20, 401, 415, 430-31, 527, 529, 531, 623, 876, 890, 896.) He also displayed

13

adequate social skills during a consultative examination. (Tr. 430.) He further demonstrated the ability to adequately function socially because he attends AA and NA meetings, shopped, and occasionally went to church. (Tr. 20, 58, 312.) With respect to concentration, persistence or pace, the ALJ found that Lansford had moderate difficulties. (Tr. 20.) Lansford was generally alert and orientated at his examinations. (Tr. 20, 431, 551, 557, 562, 571, 588, 591, 594, 639, 651, 876, 878, 890.) A consultative examiner found that Lansford could sustain concentration, persistence or pace with simple tasks. (Tr. 20, 432.) And, Lansford suffered no repeated episodes of decompensation of extended duration. (Tr. 20.) Finally, Dr. Maddox opined that Lansford did not have any marked limitations or episodes of decompensation. (Tr. 441.)

The Court holds that the substantial evidence supports a finding that Lansford did not meet the 12.04 Listing. As detailed by the government, Lansford did not cite to any evidence in the record to support a finding of disability under Paragraph A, and the record indicates, for example, that he had normal psychomotor activity and did not hallucinate. Likewise, Lansford did not meet the criteria of Paragraph B. Evidence in the record supports a finding that he did not have any marked restrictions or repeated episodes of decompensation. There was ample evidence in the record, including repeated statements by Lansford, that he was not restricted in the activities of daily living and that any restrictions, such as driving, were due to his drinking problem. Also, there is evidence in the record to support the ALJ's finding that Lansford was mildly limited in social functioning. He regularly attended AA and NA meetings, shopped, went to church, and interacted with friends frequently without incident. Evidence also supported moderate difficulties in concentration, persistence, or pace, particularly based upon the findings of a consultative examiner. (Tr. 20, 432.) Dr. Maddox also found that Lansford did not have any marked limitations or episodes of decompensation. (Tr. 44.) Thus, the Court holds that the

14

ALJ's determination that Lansford did not meet the criteria of 12.04 was based upon substantial evidence.

B. ALJ's RFC Assessment

Lansford contends that the ALJ failed to properly consider and evaluate his various limitations when determining his RFC.

1. GAF Score

First, Lansford asserts the ALJ improperly used Lansford's GAF score of 55 to determine that he had only moderate psychological impairment. (ECF No. 13 at 6.) Lansford notes that all of his other GAF scores, 49, 30, and 45, were below 50, which indicates serious symptoms or serious impairment in social or occupational functioning. (*Id.*) Lansford argues it was improper for the ALJ to pick out one GAF score of 55; he argues that the ALJ should have evaluated the other scores and evaluated them all, along with Lansford's other impairments to properly determine his RFC. (ECF No. 20 at 2.) Lansford acknowledges that one GAF score alone cannot be the basis of a determination of disability but contends that it was improper for the ALJ to choose only the highest score without referencing the lower scores. (ECF No. 13 at 6.)

In response, the government argues that Lansford overemphasizes the importance of a GAF score. (ECF No. 19 at 9); *see also Kelly v. Colvin*, No. 13-0609-CV-W-ODS, 2014 WL 2004467, at *4 (W.D. Mo. May 16, 2014)("Plaintiff also seems to suggest the ALJ was required to include greater limitations in the RFC based simply on the GAF score Dr. Parks assigned. This is incorrect."). "The GAF scale is used by clinicians to report an individual's overall level of functioning." *Quaite v. Barnhart*, 312 F. Supp. 2d 1195, 1200 (E.D. Mo. 2004)(citing American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed.2000)). "[T]he [GAF] score, standing alone, does not establish an impairment seriously

interfering with plaintiff's ability to perform basic work activities." *Quaite v. Barnhart*, 312 F. Supp. 2d 1195, 1200 (E.D. Mo. 2004); *cf. Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir.2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy.").

In addition, the government contends that the ALJ did not ignore Lansford's lower GAF scores simply because they are not cited in her decision. The government notes that an ALJ does not need to discuss every piece of evidence submitted and failure to discuss every piece of evidence does not mean that it was ignored. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir.1998). The GAF score, standing alone does not reflect an opinion about an individual's ability to work or necessarily correlate to any specific work-related limitations. Lansford's GAF scores reflecting serious symptoms do not necessarily undermine the ALJ's analysis of Lansford's work-related limitations, particularly if those limitations are reflected in the medical records or in Lansford's daily activities. In any event, the government maintains that the ALJ's opinion reflects that she was aware of Lansford's lower GAF scores. For example, the ALJ notes that Lansford's medical records show that "deterioration of his mental status is generally correlated with the times he stops taking medication, and he quickly recovers." Thus, according to the government, the ALJ properly found that Lansford's periods of increased symptoms did not reflect his level of functioning when he took his medications. (Tr. 26; Tr. 533-34 (at the time that Lansford was assigned a 30 GAF score, he stated that "he stopped medications because they knock him out & he could not work"); *see Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008)(ALJ properly determined Dr. Stanley's GAF assessment could not be relied on). "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir.2009); *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir.

16

2010). Further, the other two, lower GAF scores were assigned by Dr. Rexroat, a consultative examiner (Tr. 432, 625), whose findings the ALJ specifically referenced in her opinion. (ECF No. 19 at 11.) For example, Dr. Rexroat believed that Lansford could sustain concentration, persistence and paced with simple tasks, and the ALJ incorporated this restriction into Lansford's RFC. (Tr. 21, 25-26, 432, 624.) The government states that because a GAF score does not necessarily reflect an opinion about an individual's ability to work, it was proper for the ALJ to place more emphasis on the actual work-related restrictions contained in Dr. Rexroat's opinions than the GAF scores he assigned. (ECF No. 19 at 11.) Finally, the government asserts that Lansford has mischaracterized the ALJ's decision by stating that the ALJ used Lansford's GAF score of 55 to find that he had only moderate impairment. (ECF No. 19 at 11 (citing ECF No. 13 at 6)). The government argues, instead, that the ALJ's decision reflects her consideration of the entire record to form Lansford's mental RFC, including the results of his mental-status examinations, his described daily activities and the opinions of Dr. Rexroat and Dr. Maddox concerning Lansford's actual work-related limitations. (Tr. 20, 22-26, 432, 445-47, 624.) The government contends the ALJ was entitled to rely on this evidence instead of isolated GAF scores. (ECF No. 19 at 11).

The Court agrees that the ALJ properly considered Lansford's GAF scores when determining his mental RFC. The record indicates that the ALJ discounted Lansford's lowest GAF score because it occurred while he was not on his medication, which was needed to regulate his mental status. In addition, the ALJ referenced the reports of Dr. Rexroat which contained the other GAF scores so she must have also considered those scores as well. Most importantly, the ALJ's opinion demonstrates that she considered Lansford's entire mental health record in determining his mental RFC. The ALJ discussed and evaluated the results of his mental-status examinations,

his described daily activities and the opinions of Dr. Rexroat and Dr. Maddox, not simply his GAF scores. The Court finds that the ALJ correctly did not credit the other GAF scores when developing Lansford's RFC and instead relied on the other medical evidence. Thus, the Court finds that the record as a whole supports the ALJ's mental RFC determination. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006)("If other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to a claimant whose GAF score is as low as [the claimant's] or even lower.").

2. Right-Eye Pain Complaints

Lansford argues that the ALJ failed to take into consideration Lansford's subjective complaints of pain as a result of the surgery, which is improper. (ECF No. 13 at 6.) Lansford contends that there is substantial medical evidence to support his eye and head pain but the ALJ filed to take his pain into consideration. (*Id.*)

The government maintains that substantial evidence supported a finding that Lansford's eye pain and recovery periods did not result in any additional work-related limitations or were so severe as to be disabling. (ECF No. 19 at 7.) For example, in January 2012, Dr. Jackson noted that Lansford's eye pain was stable on medication (Tr. 1086), which is corroborated by other treatment records. (Tr. 564.) *See Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010); *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). Lansford was also never in any acute distress during his appointments, which undermines his claim of disabling pain. (Tr. 551, 562, 565, 571, 574, 578, 583, 588, 591, 594, 876, 878, 892, 1087, 1092.) *See McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011)("complaints of disabling pain are inconsistent with repeated observations

18

from treating and consultative physicians that McCoy was not in acute pain or distress").

Lansford extensive list of daily activities (caring for children, shopping, attending meetings, mowing grass) were also not indicative of disabling pain. *See Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008)(ALJ did not err in discounting claimant's credibility where there was "substantial evidence for the ALJ's observation that [claimant's] reported daily activities were inconsistent with her self-reported limitations"). Further, in a medical source statement, Dr. Jackson did not indicate any limitations due to Lansford's eye pain or otherwise mention his eye pain. (Tr. 456-61.) Lansford also does not explain what symptoms he experienced during his recovery periods that the ALJ did not account for. (ECF No. 19 at 8 (citing ECF No. 13 at 7)). In sum, although Lansford sought some treatment for eye pain, the government asserts that the evidence does not support of a finding that it resulted in greater work-related limitations than the ALJ assigned or that it was so severe as to be disabling.

The Court holds that substantial evidence supported a finding that Lansford's eye pain and recovery periods did not result in any additional work-related limitations or were so severe as to be disabling. The Court agrees that the evidence in the record does not indicate that Lansford reported disabling pain at the time of his appointments with his physicians. Likewise, his extensive daily activities belie his claim that his eye pain was disabling. His treating physician also did not find his alleged pain to be credible or intensive enough to include in his medical source statement. (Tr. 456-61.) The Court also cannot speculate as to what symptoms Lansford experienced during his periods of recovery from surgery but those ailments do not appear from the record to be disabling. Therefore, the Court finds that Lansford's eye pain was not disabling as a matter of law based upon the record.

3. Left Eye

Lansford also asserts the ALJ improperly found that Lansford's vision was normal in his left eye, despite the testimony of Lansford and Dr. Korenfeld who indicated there was a retinol hole in his left eye. (ECF No. 13 at 7; Tr. 21, 23.)

The government disagrees based upon Dr. Korenfeld's determination that Lansford had 20/20 corrected vision in his left eye, despite having a retinal hole. (ECF No. 19 at 14 (citing Tr. 1099.))

The Court finds that credible evidence, namely the opinion of Dr. Korenfeld, supported a finding that Lansford's vision was normal in his left eye, despite having a retinal hole.

4. Opinions of Dr. Jackson, Lansford's Treating Physician

Finally, Lansford maintains that the ALJ improperly gave no weight to the opinions of Lansford's treating physician, Dr. Jackson. Dr. Jackson indicated that Lansford had no right eye vision and his peripheral vision was impaired; Lansford suffered from severe mood disorder impairing his ability to concentrate and work; and suffered from mood and personality disorders, including bi-polar personality disorder. (ECF No. 13 at 7.) In particular, Lansford cites to the Social Security Regulations which state that a treating physician's opinion on the nature and severity of an impairment should be given controlling weight if it is consistent with the other substantial evidence in the record.

In response, the government maintains that the ALJ properly gave Dr. Jackson's opinion only limited weight because there was no evidence that Lansford had ever injured himself due to ordinary hazards. (ECF No. 19 at 12 (citing Tr. 23.)) The government states that "[a]lthough Dr. Jackson opined that Plaintiff could not avoid ordinary hazards in the workplace, his treatment notes contain no indication that Plaintiff had injured himself because of ordinary items, such as boxes or open doors, or had complained of difficulty avoiding such items." (ECF No. 19 at 13

20

(citing Tr. 23, 259.)) The government maintains that it was reasonable for the ALJ to believe that Lansford would have injured himself or at least complained of some difficulty avoiding ordinary hazards if he were truly as limited as Dr. Jackson opined. (ECF No. 19 at 13.) In addition, Lansford has admitted that his daily activities include caring for his two children and dogs, cooking meals, going outside by himself, shopping, moving the law, doing household chores, playing basketball, fishing, and hunting. (Tr. 20, 305, 310-13, 624, 643.) The government asserts that these activities are more extensive than would be expected from someone who could not avoid ordinary workplace hazards. Also, the credibility of Dr. Jackson's opinion is questionable given that he never cautioned Lansford to limit any of his daily activities or otherwise cautioned him to avoid ordinary hazards. (ECF No. 19 at 13.) *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)(discrediting the ALJ's opinion of the claimant's limitations where "[n]one of these restrictions appear elsewhere in his treatment records"). Finally, the government maintains that the ALJ accounted for Lansford's visual impairments by limiting Lansford's exposure to hazards, such as machinery and heights, and restricting Lansford to only occasional climbing. (ECF No. 19 at 14 (citing Tr. 23.))

The government also maintains that Dr. Jackson's opinion that Lansford suffers from a mood disorder is consistent with the ALJ's findings. (ECF No. 19 at 14.) The ALJ found that Lansford suffers from severe depression (Tr. 19), which limited Lansford's ability to concentrate and resulted in work-related limitations. (Tr. 20.) To account for this issue, the ALJ limited Lansford to work that involved understanding, remembering, and carrying out only simple instructions, which was consistent with Dr. Rexroat's opinion. (Tr. 20-21.) The government challenges that nothing in Dr. Jackson's opinion or treatment notes support greater limitations than the ALJ assigned. (ECF No. 19 at 14). In fact, Dr. Jackson found that Lansford was alert

21

and orientated, without unusual anxiety or evidence of depression. (ECF No. 19 (citing Tr. 557, 562, 578, 583, 591, 1088, 1092.))

The Court holds that the ALJ properly accommodated the opinions of Dr. Jackson that were corroborated in the medical record. ALJs are not obliged to defer to treating physician's medical opinions unless they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in the record." *Ellis v. Barnhart,* 392 F.3d 988, 995 (8th Cir.2005) (quotations omitted). The Court agrees that there is nothing in the record that indicates that Lansford was unable to avoid ordinary workplace dangers. Rather, and as demonstrated by Lansford's extensive daily activities, he seemed capable of avoiding ordinary workplace hazards. Further, to the extent that Lansford had any impairment, the ALJ properly accounted for that impairment by limiting Lansford's exposure to hazards, such as machinery and heights, and restricting him to only occasional climbing. In addition, the Court holds that the ALJ properly accounted for Lansford's mental impairment as outlined by Dr. Jackson. The ALJ acknowledged that Lansford suffers from depression and impaired concentration. Therefore, the ALJ limited Lansford's work to that involved understanding, remembering, and carrying out only simple instructions. The Court finds that these restrictions were properly tailored to Lansford's limitations as detailed in the medical records. *See Juszczyk*, 542 F.3d at 632 ("The ALJ rejected Dr. Stanley's assessment because it was inconsistent with Dr. Stanley's own treatment notes, with objective testing, and with other medical evidence in the record. Our review of the record, including reports from Dr. Pulcher, Dr. King, Dr. Flageman, and the Truman Medical Center confirms the ALJ's conclusion.").

     C.    Lansford Could Perform Other Jobs in the Economy

Finally, Lansford maintains that there is no substantial evidence that Lansford can return to his former work and that Lansford can perform other work. (ECF No. 13 at 2). The government points out that the ALJ found that Lansford could not perform his past work (Tr. 27) and, therefore, through examination of a vocational expert, determined that Lansford could perform other work existing in significant numbers in the national economy. (ECF No. 19 at 15 (citing Tr. 18.)) The vocational expert testified that a hypothetical claimant with Lansford's RFC could perform the jobs of housekeeper/cleaner, mail sorter, and bench assembler. (Tr. 28, 70-71.) Based upon this testimony, the ALJ concluded that Lansford could perform these jobs and was not disabled.

The Court holds that the testimony of the vocational expert satisfied the Commissioner's burden to show that Lansford could perform other work existing in significant numbers in the national economy. *See Cox v. Astrue*, 495 F.3d 614, 621 (8th Cir. 2007)("because the vocational expert, in response to a hypothetical that captures the consequences of [claimant's] deficiencies, described readily available occupations in which she could engage, the Commissioner successfully demonstrated Cox's ability to perform work in the economy"). Therefore, the Court holds that substantial evidence supported the ALJ's finding that Lansford could perform other work.

**VI.    Conclusion**

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **AFFIRMED**. A separate Judgment will accompany this Order.

Dated this /6ᵗʰ day of March, 2015.

RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE